## Ray, et al. v. Armstrong, et al.

(Decided November 26, 1910.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First Division).

1.  Board of Equalization Statute—Assessment of Property for Tax-ation—Legislative Act Construed.—Market values are always fixed by what is sold; therefore, that which is sold fixes beyond doubt its own fair cash value. In all the investigations of the subject of the assessment of property for taxation, and of all the schemes which have been suggested, none appear to have been thought of that would more nearly and certainly accomplish a reasonable valuation of property for assessment, than the one which has been adopted in this State. It must be assumed that the Legislature intended to do what the Constitution required, in a legal way, and so as to operate fairly upon all the citizens of the State. The Legislature has not left it to the capriciousness or uncontrolled discretion of the board of equalization and assessment, but has set a standard of evidence by which it must be guided. It was competent for the Legislature to prescribe the standard of evidence that should govern the board. and in the absence of such evidence the county assessor's returns should be deemed correct. Generally, such statutes do not provide for notice to the individual taxpayer, yet they are upheld. The county is the unit for consideration by the board; the county is notified, as are its taxpaying citizens, by the statute, where and when the board meets, and that of itself, it seems, is notice enough.

2.  Quorum of Board.—Where a board consists of eight members and all are present, if four vote in favor of a measure and three against it, and the other being present fails to vote, his silence is acquiescence rather than opposition. His refusal to vote is, in effect, a declaration that he concurs with the majority.

3.  Conclusions Reached Upholding Statute.—We conclude that the statute is not contrary to the Constitution of Kentucky, in that it destroys uniformity of taxation, or that it gave the State Board of Equalization and Assessment arbitrary power to fix values; that it does not deprive taxpayers of their property without due process of law;  that it does not deny to any citizen all the privileges accorded other citizens;  and that the board was properly constituted and organized, and adopted the resolution

complained of by a .sufficient and lawful vote. Wherefore, the judgments are reversed, the injunctions dissolved, and the causes remanded with directions to dismiss the petitions. All concur.

JAMES BREATHITT, Attorney General, and JOHN F. LOCKETT, Asst. Attorney General, for appellant.

TRABUE, DOOLAN & COX, A. E. RICHARDS, McCHORD, HINES & NORMAN, and EDWARD W. HINES for appellees.

OPINION OF THE COURT BY JUDGE O'REAR—Reversing.

This appeal involves the constitutionality of the Article XVIII. of chapter 108, Kentucky Statutes, known as the State Board of Equalization Statute. The article embraces sections 4268 to 4281, inclusive, of Kentucky Statutes (Carroll's) and forms a part of the general law of revenue and taxation adopted as a complete system of taxation, and approved March 15, 1906.

The question arises upon two actions brought in the Jefferson circuit court, one by appellee John A. Armstrong, the owner of city lots alleged by him to have been assessed for more than their cash value, and the other by Julius C. Hero, who complains of the increase as to the assessment of his personal property. In each action the county clerk and the sheriff of Jefferson county were made defendants. The relief sought was an injunction to restrain the county clerk from extending the increase made by the State Board of Equalization and Assessment upon the assessor's books and to restrain the sheriff from collecting taxes upon such increase. The circuit court granted the relief prayed for, indicating in a written opinion of the learned presiding judge the grounds upon which he found the act in question to be violative of the Constitution.

The case was prepared by pleading to an issue, and proof by affidavits. The latter procedure was by consent of the parties, and while not as satisfactory perhaps as if the facts had been developed in the usual manner, it may be said to fairly dispose of the issues of fact raised by the pleading. Upon those issues the chancellor found against the plaintiffs, appellees. As we concur in the conclusion it will not be necessary in this opinion to more than state the course of proceedings upon that point. The chancellor rested his decision of the case at least upon three grounds, each presenting pure ques-

tions of law. And it will be to those in the main that we will address our attention.

The State Board of Equalization and Assessment, created by the statute, supra, as part of the machinery for valuing, assessing, and listing property real and personal in this State for taxation, is composed of eight members, seven of whom are appointed by the Governor for terms of four years, and the eighth being the Auditor of State, ex officio a member of the board. (Section 4268, Kentucky Statutes.) Each member is required to take an oath of office. (Section 4269, Kentucky Statutes.) The statute requires the board to assemble at the State capitol on the tenth day of February annually, to perform the duties imposed on it by its provisions. (Section 4271, Kentucky Statutes.) In 1910 the board, duly appointed and constituted, met as required, and proceeded to examine into the assessments of property as returned by the various county assessors, and the lists of conveyances of real estate furnished by the several county clerks, and heard other evidence touching the valuation of taxable property so returned. Finally they entered an order on their records raising the valuation of farm lands, town lots, and personal property in Jefferson county twelve (12) per cent., and duly certified the result to the county clerk of that county.

The chancellor thus states the issues raised, and his conclusions upon the first five of the objections urged by the plaintiff, appellees:

"Plaintiffs claim the action of the board is ineffectual, because: (1) W. R. Waters, a member of said board was ineligible to hold said office, in that he was not the owner, in fee, of real estate within the State; (2) in reaching its conclusions concerning the assessments, the board did not follow the statute, but balloted as to the per centum of increase in assessment, and arbitrarily determined the per centum which the assessed value of the several classes of property bore to the fair cash value thereof without regard to the evidence or without any knowledge on their part as to said cash value, and were influenced by evidence as to property omitted from assessment, and the inability of the sheriff of Jefferson county, by reason of pending litigation, to collect taxes upon a large amount of property; (3) said board arbitrarily increased said assessment because of the assumed fact that much personal property in Jefferson county had been omitted from assessment, and

the board thus used its powers for the purpose of increasing the revenue of the State and not for the purpose of equalizing the assessments between the several counties; (4) said board arbitrarily failed to increase the assessments of many other counties, although the board conceded that the said assessments were much less than the fair cash value of the property therein, thereby working a discrimination against the plaintiffs and other taxpayers of Jefferson county, and depriving them of the equal protection of the law, and of due process of law; (5) that the transfer lists of many counties were wanting, or so incomplete, that the board necessarily acted arbitrarily in fixing the percentage for such counties; (6) that section 9 of the act (Kentucky Statutes 4276) which forbids the raising of any assessment in counties where there has not been as many as five sales of land during the past year discriminated in favor of those counties and against Jefferson county and its property owners, and thereby preventing uniformity of taxation, and denied the plaintiffs the equal protection of the laws in violation of the State and Federal Constitution; (7) that said assessment was increased without notice or opportunity to plaintiffs to be heard before said board whereby they would have been deprived of their property without due process of law; (8) that the act of the board May 20, 1910, in attempting to make said increase of twelve per cent. and was the act of only four of said eight members, all of whom were then present, and was ineffectual for the reason that it failed to receive a majority of the votes of the board; (9) that section 8 of the act of 1906 (Kentucky Statutes 4275), which peremptorily requires the board to increase or diminish the assessment of personal property at the same rate which said board increased or diminished farm lands, and thereby increasing the assessments of personalty in Jefferson county from $37,799,855 to $42,335,838, although the ratio of assessed value to the real value of personalty bore no relation to the ratio of the assessed value to the cash value of farm lands, is unconstitutional in that it attempted to create a board of assessment and not a board of equalization of assessments.

These objections will be considered briefly in the order given.

1. Section 4268 of the Kentucky Statutes prescribes the ownership in fee simple of real estate located in this State as one of the requisites to membership upon the

board. It appears from the uncontroverted affidavit of
W. R. Waters, that at the time of his appointment he was
the owner in fee simple of a farm in Shelby county, Ken-
tucky, containing 537 acres of land, which he has since
exchanged for cash and several lots adjoining Tyler
Park in Louisville, Ky. These lots he now owns in fee
simple.

This objection, therefore, fails, and needs no further
consideration.

2. The second objection challenges the board's entire
method of procedure in equalizing the assessments of the
counties. It is contended that the statute is peremptory
and requires the board to find the average percentage of ·
the assessed value to the cash value of lands and town
lots in each county, by using only the county court clerk's
tabulated statement of assessments and sales in that
county (4277); and having thus obtained a percentage of
assessed values to real values for the entire State, it is
to be applied to each county by raising or lowering its
assessment as may be necessary. (Section 4274.)
Plaintiffs have filed affidavits which show that at the
hearing of Jefferson county, different members of the
board asked the witnesses about omitted personal prop-
erty in that county, and particularly about the small
amount of bank deposits, diamonds, bonds, livestock,
farming implements, etc.; and the conclusion is drawn
therefrom by plaintiffs that the board really fixed an
arbitrary assessment on the lands of Jefferson county by
considering supposed omitted personalty instead of con-
fining itself to the tabulated statements of the county
court clerk.

It will be remembered however, that section 4273 of
the statute which provides for the making of tabulated
statements showing the comparison of assessed values
with sale values of land and town lots, also contains the
further provisions which give the board "authority to
obtain and use any other evidence as to values, and
whether or not the property conveyed has been assessed
at a greater per centum of its actual value than in cases
where property has not been conveyed." While this
section does not affect the method of finally fixing the
average percentage of assessed values of lands in the
county, it authorizes the board to go outside of the coun-
ty clerk's tabulated statement and use "any other evi-
dence" in arriving at those values which were to consti-
tute the component parts of the calculation. Proceeding

under that broad construction of their powers, as I think they had the right to do under the statute, it is not for others to say, and it is indeed immaterial, that any particular piece or kind of testimony influenced any particular member of the board. The testimony shows beyond question that they relied mainly upon the tabulated statements or transfer sheets in reaching a conclusion. Under this procedure I see no valid objection to taking the sense of the board by motion and ballot. Really, there is no other practicable way of reaching a conclusion binding upon all in a body of several members where each member is free to form his own conclusions.

Third objection—That the board arbitrarily increased the assessments of lands in Jefferson county because of the assumed facts that such personal property in that county had been omitted from the assessment, thereby using its power for purpose of raising revenue rather than for equalizing the several counties, presents a question of fact and is not sustained by the testimony. This objection evidently is based upon the fact that members of the board asked questions as to the omitted personal property as heretofore indicated; but, having the right to take evidence, the finding of the board upon that evidence while acting in good faith and within its jurisdiction, as is the case here, cannot be annulled by injunctive process.

Fourth. Did the failure of the board to raise the assessments in a large number of counties wherein it was concluded by the board that the assessments had been made at much less than the value of the property, render invalid the increase in Jefferson county? The petition in this respect is too general in its allegations to set forth a cause of action. The allegations may be true and Jefferson county may have still been raised only to its proper equalization rate. The petition should have set forth the facts from which the court must draw the conclusion asserted by the pleader. The legal effect of this objection lies in the charge that the board, having failed to make an average percentage of assessed value to cash value of lands in any county, it proceeded without a standard of comparison, and therein acted arbitrarily.

In its report to the Governor, the board said:

"The revenue laws provides that all property shall be assessed at its fair cash value. It is not contended that this was done in a single county; therefore, the board of

equalization was not privileged to raise any returned assessment. We selected those counties that most nearly conformed to the requirements of the law and endeavored to equalize the others with them. We do not claim that there was a perfect adjustment of values, but a majority of the board gave a careful investigation and equalized property as nearly as possible with scant evidence and under an imperfect law. The conditions under which we worked were not favorable for accuracy.''

In making from all the evidence before it, a standard of those counties that most nearly conformed to the requirements of the law, the board did not necessarily depart from the provisions of the equalization statute, when fairly construed. Some standard of comparison was absolutely necessary for intelligent action, and in fixing that standard the board was not confined to the transfer sheets. Equality and perfection in matters of taxation are unattainable. The procedure and the results of the board were necessarily only an approximation to equality, and evidently were so expected by the legislature when it enacted the law.

Fifth. The same answer may be made to the fifth objection, that the records of transfers and assessments of some counties were absent and others incomplete. The petition does not specify what counties are within either of these classes, or in what respect the records of either are incomplete. Moreover, the objection rests upon the erroneous theory that the board is confined to a consideration of the tabulated lists. If that were true, it would have been practically impossible for the board to proceed, since the absence of the lists from any one county would have been sufficient to prevent action. Certainly the Legislature not only never intended such a result, but in giving the board the authority to consider other evidence, it guarded against such a contingency.''

So far we concur in the conclusions reached by the chancellor. The sixth ground asserted by the plaintiff against the validity of the board's action, assails the act of the Legislature as unconstitutional, wherein section 4276, Kentucky Statutes, is particularly involved. That action reads:

"In the event that there has not been as many as five sales of land in any county in any one year next preceding September the first, then the assessment of real estate and personal property for the county shall remain

as fixed by the county board of supervisors, and the same rule shall apply to town lots."

Appellees contend, and the circuit court held, that the effect of the provisions just quoted was to deny to appellees and other taxpayers of Jefferson county the equal protection of the law, and the whole act was, therefore, void, as thereby it offended the fourteenth amendment to the Constitution of the United States.

Section 4275 of Kentucky Statutes, and 4277, Ibid., are attacked upon the ground that they attempt to confer upon the board arbitrary power in fixing values for assessment, and are offensive to the State Constitution which requires taxation to be uniform.

A brief outline of the provisions of the statute at this point will aid in its study.

In its sub-title the act denominates this board the "State Board of Equalization." Section 4268 provides for the membership, and adds "they shall constitute a State Board of Equalization and Assessment." Section 4274 (Kentucky Statutes) speaks of it as "The said board of equalization." Section 4275, Ibid., uses the same term. Section 4278 says: "When the board shall have completed its equalization of assessments for any one year," etc. Sections 4279, 4280 and 4281 speak of the board as the State Board of Equalization. In the whole article there appears but once an expression indicating that the power of the board is other than that of equalizing assessments, which is in section 4280, wherein it is said:

"All rates of taxes as herein provided for shall be extended by the secretary on the assessed valuation of the property as equalized and assessed by the State Board of Equalization."

A careful study of the whole article leaves no doubt in our minds that the scheme is one of equalization, taking the standard provided by the Constitution of the State as a basis. It is not alone, as was a former act, to equalize values as among the counties. It is to equalize the counties, it is true, but to equalize them by the standard of the Constitution.

The various county clerks, who are the custodians alike of the assessment books and of the record conveyances of real estate, are required to furnish for the use of the board a list of all conveyances of real property in their counties within the year prior to September 1st, showing particularly the consideration named in the conveyances, and the assessed value of the same properties

on the assessor's books for the corresponding year. (Section 4273, Kentucky Statutes. By section 4274 the board is required to "fix the percentage of the assessed value of real property at its fair cash value." By section 4277, Ibid., the board must find "the average percentage of assessed value to cash values of lands and town lots in any one county by taking in said tabulated statement the aggregate assessed value of all tracts of land and town lots, town lots being kept separate, and calculating what percentage said aggregate assessed values are of the cash values of the same, time payments being reduced to cash value on the basis of six per centum discounts." The scheme is one of equalization. The plan is to bring all property in the State to a fair cash value standard, the surest method possible of attaining "equality and uniformity," so much harped on by critics of all taxing systems. The Constitution requires that all property be assessed "at its fair cash value, estimated at the price it would bring at a fair voluntary sale." (Section 172, Constitution.) All the machinery for assessing property for taxation looks to that result. The county assessor is sworn to so assess the property. In the section of the Constitution just cited he is subjected to severe penalty for willfully failing to so assess it. The taxpayer is sworn to list his property on that basis, the assessor is required to reject the taxpayer's valuation if it is not on that basis, and to so value it himself; the county board of supervisors are appointed for the purpose mainly and are likewise charged, to revise and correct assessments so as to attain that standard. Yet with all that the bald truth is, as everybody knows, it is not generally done. The Legislature has attempted to meet the situation. For what purpose? Merely to equalize assessments among the counties, so that an average of valuation would be attained throughout the State? That was the purpose of the act of 1884, undoubtedly. But the Constitution of 1891, and its positive requirements on the subject, made it necessary to enlarge the scope of the legislation. An act was passed in 1890 requiring the State Board of Equalization to equalize all property on a basis of 70 per cent. of its actual or cash value. This court held in Louisville Ry. Co. v. Commonwealth, 105 Ky., 710, that the new Constitution repealed that act. Then it was that the present statute was passed, in which it was provided that the basis of equalization should be the fair cash value of the property assessed, not the average assessed value,

nor any other per cent. of the cash value. The State has found it to be necessary in order to accomplish the purpose of the Constitution, to provide not only the county assessors, and the county board of supervisors, who go minutely into each list and search the taxpayer's conscience, but to establish in addition a board less subject to local influences, to sit at the seat of government, and then taking a careful survey of the whole taxable property of the State as returned to the State Auditor, to fix a valuation upon the whole property by counties that will satisfy the requirements of the Constitution. But, from the very nature of the case, such a board could not know the prevailing market prices of all property in each of the 119 counties of the State, nor would it be practicable perhaps to hear great numbers of witnesses from each. The Legislature taking the cue from the Constitution, has adopted for the guidance of the board a criterion for measuring, for ascertaining, what is the fair cash value "estimated at the price it would bring at a fair voluntary sale," of the property which had been assessed. Men may well differ as to the market value of a thing which has not been sold. It is a matter of opinion. But when it has been sold, at a voluntary sale, it is no longer a matter of opinion, but is a settled fact. The "fair cash value, estimated at the price it would bring at a voluntary sale" of a particular piece of property which has just been sold at such a sale is the price it brought. Such is the common sense view of it; and such is the fact. Then turning to the assessment of the same property, it will be discovered whether that same value was placed upon the property in the assessment. There is but one class of property the sales of which are required to be recorded. That is real estate. Therefore, that class only furnishes evidence, not provided alone for assessing purposes, but where other motives will probably outweigh and control so as to have the real transaction disclosed in the great majority of instances, evidence of the most believable kind as showing fair cash or market values. If all the real property in a county should change ownership in a year, it would show with reasonable accuracy the fair cash value of all the real estate in that county. But it is not likely that that will ever occur. Still, that which in fact was sold at fair voluntary sale, shows what the state of market is. Market values are always fixed by what is sold, not by what is not sold. Thereupon, that which is sold fixes beyond doubt its own fair cash value,

and fixes with equal certainty, in legal intendment, the fair cash value of all such property "estimated at the price it would bring at a fair voluntary sale." If that which was sold, and of which the conveyance truly shows the consideration, shows uniformly a difference between selling value and assessed value, it is a reasonable inference that that which was not sold but assessed was assessed at the same ratio of value. Here and there will be a man who will give his property in at its cash value. But the general course is, to list one's property on the same basis that his neighbors list theirs. For they know, just as the appellees here do, that if they are assessed on actual values, while others are assessed at less, they will bear proportionally a greater share of the public burden than they should. They feel forced to the expedient of adopting the average scale of values, for self protection. They attempt to create the result by so placing values on their lists, that appellees are seeking by this suit to attain. The legislature adopted real estate values as the standard of evidence of all values. It is not only more easily ascertained from public records what such values are, but they fluctuate less radically, are more uniform in their stability. It, therefore, affords a more certain standard of market values in general than any other species of property. But why farm lands instead of town lots? It is not as appellees suppose, and as is intimated in the arguments, out of partial regard for the agriculturists. In this State farm lands are the main basis of wealth, constituting the greatest portion of all the property in the State. They are affected less in values by artificial conditions, than is city or town property. Their values are, therefore, less speculative, and they afford, for that reason, a more certain evidence of a probably uniform value throughout the year than other real estate subjected to more artificial influences, and more violent fluctuations. Still the selling values of town lots are required to be reported to the board just as the sales of farm property are. The lists are to be used to enable the board to determine what is the proportion of selling value to assessed value of lands, as furnishing a basis for determining what was the probable proportion of selling and assessing values of all other properties. The values of town lots are not to be excluded in settling upon the proportion of assessed and selling values of other lands. They are to be considered as throwing some light on that subject, as they doubtless do in fact.

As to personalty, section 4275, Kentucky Statutes, provides:

"The said board of equalization shall also equalize the personal property of every county in this Commonwealth by adding to or subtracting from the list of personal property, as the case may be, the same per centum as was added to or subtracted from the list of farm lands for the same county, and for this purpose the average per centum of assessed value to cash value of farm lands shall be used, and in determining such per centum, fractions less than one-half shall be rejected, and fractions of one-half or over shall be counted as one."

It is disclosed by the last clause of the section just quoted that approximation was the utmost hoped for in the result. So it is of the whole plan. It is of course known that there are some persons in the State who own personal property only, and some who own real property only. If the latter undervalue their property for taxing purposes it would not necessarily follow that the former did the same. But in the vast majority of instances taxpayers own both kinds of property. That is the general situation. Where it is otherwise it is exceptional. The same motive that would actuate the owner of real property to undervalue it for purposes of taxation, would control him in undervaluing his personal property also. And it is more than likely, it is practically certain, judging from human nature, that the party would follow substantially the same course with respect to each. Having the purpose in view, and having the same opportunities for accomplishing it, the means being equally available to each, he would most likely pursue the same method. Following the course of least resistance would be his instinct in that as in other things. It is more than likely too, that the man who owned personalty alone would follow the course of his neighbor who owned both personal and real property in valuing it for taxation. He would not be likely to adopt a higher standard merely because he owned no land. Then the county assessors would likely follow the same plan, and use the same standard of valuation of personal property, whether the owner also owned land or not. The general result in a county is more than apt to be uniform, and to have been attained by a uniform course on the part of the assessing officers. If the reasoning just employed be sound, it follows that the Legislative plan of ascertaining whether, and how much, personalty a given company had been undervalued, or over-

valued, would with almost exact precision accomplish the legislative purpose, which was to have adopted the Constitution's standard of assessing values. And it would operate upon such a vast majority of the property within the jurisdiction of the board as to approximate the acutal conditions, that is the actual fair cash value of all the property under consideration. Let it be assumed that such was the purpose of the legislation; that some method of general application had to be adopted; that it was within the competency of the Legislature to have adopted some plan having that purpose; then what other plan would more nearly do it? In all the investigation of the subject by publicists, and of all the schemes which have been suggested, none appear to have been thought of that would more fairly, more certainly accomplish it under our form of government and under our Constitution, than the one which the Legislature has adopted. It must be assumed that the Legislature was endeavoring to do what the Constitution required, in a legal way, and so as to operate fairly upon all the citizens of the State. It would be more than idle to presume that the Legislature was in league against taxpayers generally—trying to do them mischief.

What the Legislature had in view in the enactment of this article was to provide a system of general application, simple enough to be practicable, expeditious enough not to thwart the purpose and necessity of promptly collecting revenue to run the government, yet just, reasonable and approximately certain in its working. So the Legislature has itself adopted a standard of evidence, which it requires the board to observe, and which it declares to be sufficient. In all other matters the Legislature adopts, creates, standards of evidence, and changes them. These standards the courts must and do observe, and are controlled by. They are all arbitrary, in a sense. They are all artificial, whether the creature of the Legislature or the growth of the common law. None of them are infallible in discovering the truth. Under any of them at some time injustice to a particular individual results. Their very universality makes this so. Yet rules of evidence are indispensible in government. Without them, he who is to determine the fact is left to his own devices. Uncertainty, confusion, ensue. And there could not be a wider door for arbitrary action, so abhorrent to a people under a government of law. Let us suppose the Legislature had provided a board of equalization,

whose duty it was to equalize the assessments of the several counties of the State so as to bring them up to the requirements of the Constitution. Let it be supposed further that the board was given power to summon witnesses, produce and examine documents, and hear such evidence and complaints as to them might seem wise and proper. Then suppose the board had pursued the same course now required by the statute. Who could say that the facts elicited by the transfer sheets, with such other evidence as might have been heard by this board in its 1910 sessions, did not justify the inference, as a logical conclusion upon the probative force of the documents, and with their knowledge of general conditions in the State, such as the courts take judicial notice of, just as the Legislature by the enactment in question has required them to do? The difference is, the Legislature has not left it to the capriciousness, or uncontrolled discretion of the board, but has set it a standard of evidence by which it must be guided. It has made it less uncertain for the taxpayer, and has adopted in his behalf, and for his protection, as well as for the fulfillment of the Constitution's emphatic mandate, a course which the board might properly otherwise have adopted, and which is the least hurtful of any general plan it could adopt, so far as we can see or has been pointed out to us, looking to a general equalization of all assessments. But is it said that the Legislature cannot deprive a citizen of his rights by imposing upon the courts a conclusive presumption. That may be true. When the rights of a citizen have been taken from him by such enactment it will be time enough to consider its validity in the particular instance. But the citizen has no right to have his property, and property in general, assessed at less than its fair cash value. If the Legislature devise a means of accomplishing the result of assessing his and all other property at its cash value, and to do so has set a standard of evidence which to the courts appear reasonably just and certain of arriving at the truth, it is not an infringement of the citizen's right so long as the results do not overreach the requirement of the Constitution in that respect. But appellees contend that if it should turn out (and it may) that one man had listed his personal property say in Jefferson county at its fair cash value, the action of the board in raising all personalty in that county twelve per cent. because owners of farm lands in that county had failed to list their lands at their fair cash value by as

much as twelve per cent., it would thereby be exceeding
the Constitution, and compelling him to pay more than
the Constitution required in any event. Vicarious visi-
tation in tax matters is not infrequent. Every delin-
quent adds something to the burdens of others not de-
linquent, which they would not have had to bear but for
the former's shortcoming. Even the county assessor
might put an excessive valuation on the same complain-
ing taxpayer's property. Then the county board of
Supervision might increase it, in an honest but erroneous
judgment. That would not affect the validity of the par-
ticular assessment, much less that of the whole county
assessment. So any system may, and almost inevitably
does work injustice in exceptional instances. But the
project here is not to deal with the individual's assess-
ment. The county here is taken as the unit. It is raised
as a whole, or lowered as a whole, or left alone as a
whole. The legislative view was that it was more than
probable that conditions existing in a county showing
a general undervaluation, or overvaluation, would be sus-
tained throughout, inasmuch as the same officials did it
all. A county may be out of debt, and require the sim-
plest and most economical government. It would have
little incentive to raise much revenue for county pur-
poses. A low valuation would serve its needs. Yet, its
duty to the State government is no less than that of the
county which had to maintain a high rate of assessment
to enable it to raise enough taxes to get along. The lat-
ter would in consequence pay more on the dollar to sus-
tain the State government than the former (as the same
assessment answered for both State revenue and coun-
ty levy). It was to equalize this burden in part, by com-
pelling the county that was too low in its assessments to
come up to the average, to the Constitution's standard,
that the act was enacted. Hence the situation is dealt
with by counties. The hardship which appellees im-
agine (but which is alleged, by the way, to exist as to but
one of them) is an incident due to the place of residence,
and of the exigencies of a taxing system which demands
universal application to be efficient and at the same time
just. In this connection we will notice another argument
on behalf of appellees. It is said that if all holders of
personal property in a county had actually listed it and
it had been assessed in the first instance at its fair cash
value, yet if owners of real estate in that county had
undervalued their holdings, the board would be com-

pelled under the statute to raise the valuation of personal property to correspond with the raise found necessary as to the realty, thus exceeding the Constitutional exaction. But not so. The Constitution must be read in connection with the statute, and section 172 of the former will, and must be, borne in mind at every step of the board's proceedings. It is no less the law, indeed in case of conflict with the statute, supersedes it to that extent. So that if the conditions should arise that have been imagined and suggested (though they are scarcely likely to) the board would be under the necessity of not raising the personalty beyond its fair cash value in any event. The board has the means of such information at hand. It is impowered to hear other evidence. It does so. The cardinal point in the law governing them is to assess at fair cash value. That cannot be exceeded as to any county, in any event.

We now recur to section 4276, Kentucky Statutes, which has been quoted in an earlier part of this opinion. It is argued, and so held by the court below, that as it was possible under the statute for some one or more counties to escape equalization at the hands of the board, it would result that those counties would not have to bear any increase which the board might find necessary to put all other assessments on a fair cash basis, albeit the counties omitted might not have been assessed higher proportionately than those raised. It does not so follow. If the counties had reported, the board nevertheless might not have raised them. As a matter of fact several counties failed to report in 1910 the list of transfers required. Nevertheless the board raised two of them, Montgomery and Rockcastle, while another which did not report, but was shown to have had more than five transfers of real estate during the year, was not raised (the county of Bullitt.) This shows that in its practical working, and we may add, in its proper working, the board was not bound by the omission of the county clerk to send in the list of transfers. It may have recourse to other sources of information. But, if such a thing could occur (and it is scarcely more than a remote possibility) that in any county there should not be more than five transfers of real estate in a year it would result that there would be lacking such evidence of market values in that county as, in the opinion of the Legislature, would justify interfering with the assessor's returns. It is to be observed that the assessors' lists are not presumed by the act to

be inaccurate. Just the contrary. Evidence is required to justify overturning those officials' valuations. In the absence of evidence the presumption which universally attaches that a public official who certifies under his oath that he has performed a duty imposed upon him by law, applies. As the Legislature was enacting a standard of evidence certain, open, and not dependent upon fickle memories or biased interests, it saw proper to add, which doubtless would have followed without the addition, that in the absence of evidence the assessors' valuation should stand.

But there is nothing in this record to show that there is any county in this State in which there were not five transfers of real estate recorded last year. Nor is it charged that there was such. Until there is, it is not possible for any county, or any citizen, to be prejudicially affected by the section under discussion, whatever view might be taken of its effect upon the validity of the statute when the conditions do arise. Although the last paragraph seems to us to meet the objections of appellees, we go farther and say that it was competent for the Legislature to prescribe the standard of evidence which should govern the board, and to add that in the absence of such evidence the county assessor's returns should be deemed correct.

It is next urged that the act is vicious, and violates the fourteenth amendment to the Constitution of the United States in that its effect is to take the citizen's property without due process of law. It is argued that as the act does not provide for giving a hearing to the individual taxpayers by the board, they are not given "a day in court." Just what notice must be given the taxpayer to satisfy that provision of the Federal Constitution has never been set down. It is, though, settled that it does not mean such notice as a suitor in court is entitled to. But if the taxpayer is given an opportunity sometime during the assessment proceeding to be heard, it is deemed sufficient. (C., N. O. & T. P. Ry. Co. v. Commonwealth, 81 Ky. 492; Same case, 115 U. S. 331; McMillen v. Anderson, 95 U. S. 37; Cooley on Const. Lim.; State R. R. Tax Cases, 92 U. S. 575.) Our statute for equalizing taxes is not new in this State, nor is it peculiar to us. Generally such statutes do not provide for notice to the individual taxpayers, yet they are upheld. (State R. R. Tax Cases, 92 U. S. 575; Pittsburg, &c., R. Co. v. Backus, 154 U. S. 421; Cleveland, &c., R. Co. v.

Backus, 154 U. S. 439; Scammon v. Chicago, 44 Ill. 269; Hyland v. Brazil Block Coal Co., 128 Ind. 335; Hubbard v. Goas, 157 Ind. 485; Field v. Russell, 38 Kan. 720; State v. Hannibal, &c. R. Co. 101 Mo. 120; Dundy v. Richardson Co., 8 Neb. 508; Territory v. Albuquerque Nat. Bk., 10 N. Mex. 283; Spalding v. Hill, 86 Ky. 656.)

But it is contended that ours is more than an equalization statute—that it is also an assessing statute. Stress is laid on the name of the board as indicating such purpose. The act which the present one superseded denominated the board as "State Board of Equalization of Assessment." Furthermore it restricted, the first one did, the board to equalizing assessments by striking an average among them. The next went further, and made 70 per cent. of the cash value the standard. That act seems not to have been called into question before the adoption of the present Constitution. The existing statute as pointed out, goes yet further, but is still, we think, only an equalization statute. The board does not list property. But it fixes a new and different value upon it, it is said, and therefore may be deemed an assessing statute. Under the old statute when a county was raised so as to average with others which were lowered, the effect, so far as the individual taxpayer in the raised county was concerned, was precisely the same as under the existing statute. He had the same notice provided then as now. Yet it was upheld on this score. (C., N. O. & T. P. R. R. Co. v. Commonwealth, 81 Ky. 491; Spalding v. Hill, 86 Ky. 662.) As before indicated, the county is the unit for consideration by this board. The county is notified, as are its taxpaying citizens, by the statute when and where the board meets, and that of itself, it seems, is enough. (Spalding v. Hill, supra; Ky. R. R. Tax Cases, 115 U. S. 321.) In addition the county judge, as the chief executive officer of the county, is notified of the board's proposed action before it becomes final. He then has the privilege of selecting five witnesses to appear on behalf of the county before the board, in opposition to the proposed increase. If it is proposed to increase the county's valuation it may be fairly assumed that the county will resist it, and that the witnesses are selected with that view. But, it is insisted that it is possible for even these persons so selected, to be not representative in sympathy with the individual taxpayers. Which may be true. But this is not the only case where representatives of a great number having a common in-

terest may act for all, and bind all by their action. To illustrate, these appellees are in these suits exemplifying the precise principle. They have volunteered to act on behalf of all the taxpayers of Jefferson county, and for that matter the whole State. They are but two in number. Yet they assume to represent, and in law do represent all of their class. In truth they may, but illy reflect the desire of the others, or many of them. Yet they are empowered by law to represent them, to conclude them by their representation; to employ counsel, and make such presentation as they think proper, which perchance might not be all that could have been done. Still, as representatives of a number too great to be heard in person, they are given these rights by law. It is not difficult to imagine that the representatives provided by this statute for all, including the complainants, would be as fair representatives as any similar or smaller number who might volunteer. It is a fact that in the instant case Jefferson county's representatives before the board did resist the increase, and did it with effect, as it was not raised as much as was at first decided to do by the board. But, advancing the consideration another step, it is not true that the individual taxpayers have not had notice of their assessment now complained of. They had notice given by the statute of the time and place of the boards meeting, and could then and there have appeared had they so desired. In addition, the statute provides that they shall each in person make out and give his list of property, with the fair cash valuation of it, to the county assessor. They were afforded an op·portunity to do so, and they did. If they failed to give the correct valuation, it does not lie in their mouths to say that it may not be fixed by the assessor or some other assessing board. They are not entitled to be heard at every step of the proceeding. Equalization is only one step in the act of assessing. (Ames v. People, 26 Colo. 83.) It is only at one point in the assessment that they must have notice and an opportunity to state their valuation. That they have had. The circuit court decided against appellees on the last point. There was a radical defect in the petitions, commented upon by the trial court, which is also clearly disclosed throughout the record, in this. It is not alleged, nor is it shown, that the taxable property of Jefferson county, either real or personal, is assessed by the proceedings sought to be enjoined at more than its fair cash value. Nor is it averred or shown that the effect of the statute called in question is

or will be to increase the assessment of any county beyond the fair cash value of the property in that county. It is true that it is alleged that the increase in value as made by the board operates to raise the assessment in Jefferson county some twelve million dollars. Yet it is not alleged that when so increased the fair cash value of such property is not as much as the valuation put on it by the board. This feature was averted to in C., N. O. & T. P. Ry. Co. v. Commonwealth, 81 Ky., at page 504, in this language:

"While these companies may not have the right to appear before the county board of each county, they have had the value of their property fixed by the railroad commissioners, and are not even complaining now that the valuation is too high."

In Louisville Ry. Co. v. Commonwealth, 105 Ky., 710, the contention of the appellant was that because the statute then in existence respecting the equalization of assessments by the State Board of Equalization required the board to take 70 per cent. of the cash values of the property assessed as the basis of equalization, and as the board of Valuation and Assessment (an entirely different body) was required to and did assess appellant's property at its fair cash value, it worked a discrimination against that appellant and denied to it the equal protection of the law. That was a much stronger case on the alleged facts than is this one. Yet this court had no hesitation in declaring that the complaint was not well founded. We then said that it could not justify the assessing board which assessed that appellant's property to disregard the Constitution because other assessing officers violated it; that no one would be heard to complain so long as his own property, or all the property of the class to which his belonged, was in fact assessed at no more than its fair cash value.

Every averment in the petitions in these cases may be taken as true, still it remains undisputed that the operation of the statute impugned was only to produce an assessment of all property at its fair cash value. It may be doubtful even whether the result has ever been to assess the property in all the counties at its cash value. In fact the board in its report to the Governor admits that it has not gone so high, because of certain defects pointed out. Surely the operation of an assessing statute, intended to assess all property at its fair cash value, but which has only succeeded in raising the assessment

somewhat, yet falling short of reaching the fair cash value, is not a ground of complaint for taxpayers that their property has been assessed too high.

Finally, it is insisted that the board did not pass the order or resolution fixing the increased valuation of ·Jefferson county. The statute provides that five of the board may constitute a quorum for business. (Section 4268, Kentucky Statutes.) Kentucky Statutes, section 448, reads as follows:

"Words purporting to give authority to three or more public officers or other persons, shall be construed as giving such authority to a majority of such officers or persons."

It is argued that the authority is given to the board, consisting of eight officers, that at least five must concur before the action of the board is valid. The statute (section 4268, supra) gives all authority to a quorum, five, that it gives to a full board. If five are present, they might lawfully do all that the whole number might have done. Section 448, supra, then gives to a majority of a quorum as ample power as the quorum had. Therefore, if five only were present, three concurring could adopt any order or resolution that the five could have adopted.

But in this instance all the members were present— eight. Four voted to raise the assessment of Jefferson county, and three voted against the proposition. Four is not a majority of eight. The remaining member though present and sitting in the board, did not vote. What is the legal effect of this conduct? If it be held that his not voting had the same effect as if he had been absent, it would belie the facts. For he was not absent. His silence should, we think, be construed as concurring with the majority. His silence is acquiescence rather than opposition. His refusal to vote is, in effect, a declaration that he concurs with the majority. Otherwise he should vote against the majority, which would have defeated the proposition. (Rushville Gas Co. v. City of Rushville, 6 L. R. A. 315; Wilcock, Corp., section 546; Stat. v. Green, 37 Ohio St. 227; Luntz v. People, 113 Ill. 137; Cass County v. Johnson, 95 U. S. 369; St. Joseph Twp. v. Rogers, 83 U. S. 16; State v. Renik, 37 Mo. 270; Everett v. Smith, 22 Minn. 53; Oldknow v. Wainwright, 2 Burr. 1017; First Parish, &c. v. Stearns, 21 Pick. 148.)

The circuit court decided this point in favor of the plaintiffs.

We conclude that the statute is not contrary to the Constitution of Kentucky in that it destroys uniformity of taxation, or that it gives the State Board of Equalization and Assessment arbitrary power to fix values; that it does not deprive taxpayers of their property without due process of law; that it does not deny to any citizen all the privileges accorded other citizens; and that the board was properly constituted, and organized, and adopted the resolution complained of by sufficient and lawful vote.

Wherefore, the judgments are reversed, the injunctions are dissolved, and the causes remanded, with directions to dismiss the petitions.

The whole court sitting. All concur.