## Bryant v. Hamblin, et al.

## Sutton, et al. v. Bryant and Hamblin.

(Decided March 28, 1919.)

## Appeals from Whitley Circuit Court.

1. Public Lands—Boundaries—Surveys.—A patent excluding all lands within the boundary theretofore surveyed has application only to valid, subsisting legal entries and surveys, and does not include surveys never perfected as required by law.

2. Adverse Possession—Boundaries.—To support a title by adverse holding the possession must be continuous, actual, open, notorious and peaceable for at least fifteen years; the exterior boundary lines of the land claimed must be well defined, that is, either actually enclosed or so marked that the land is susceptible of identification by its description, and the possession must have been of such a character and extent as to preclude the idea that the right of possession was in any one else.

3. Adverse Possession—Boundaries.—To extend his possession beyond his close, an adverse claimant, as against seniors in title, must claim and hold the remainder of the land either under color of title or to a well marked boundary for a period of fifteen years.

4. Public Lands—Failure to Register Survey.—One entering under a county court land warrant, executing a bond, for cited consideration, not paying for the land and failing to register his survey in the land office within the time specified by statute, legalizing the proceedings, forfeits all rights under the warrant or survey.

5. Adverse Possession—Actual Possession.—There must be an actual possession of some part of the land claimed adversely with the intention to hold and possess it all; mere accidental or unintentional holding or possession is not sufficient.

6. Appeal and Error—Records—Presumptions.—This court will conclusively presume, after submission, that a record brought here on schedule filed in the lower court, as prescribed by the Code of Practice, is a complete record.

H. G. GILLIS for Sutton heirs and Richard F. Hickman.

STEPHENS & STEELY for Roberta S. Bryant.

J. B. SNYDER and B. B. SNYDER for Sumner heirs.

ROSE & POPE for Pleas Hamblin.

OPINION OF THE COURT BY JUDGE QUIN—Affirming in part and reversing in part.

The appellant, Roberta S. Bryant, plaintiff below, is the owner of approximately 1,000 acres of land under

what is familiarly known as the "Hudson and Wait Patent," No. 24,081, dated October 18, 1855, under a survey of September 4, 1854. All land previously appropriated within the exterior boundary of said patent is expressly excluded therefrom. Plaintiff is asserting title to only so much of the land as was vacant and unappropriated on the day of the survey, the acts complained of in her petition having been committed on the tract not embraced within the exclusion. She alleged that the defendants, Pleas Hamblin and others, had entered upon her lands, on the waters of Buzzard, Crow and Cantrill creeks, and had begun cutting the timber and committing other trespasses thereon; and she asked that they be enjoined and restrained from committing other trespasses upon her property.

By an amended petition Richard F. Hickman, the heirs of J. F. Sutton, the heirs of Nehemiah Sumner and others were made defendants, it being alleged they were claiming an interest in the land described in the petition, and were threatening to commit trespasses upon said land. An injunction was asked against each of them.

From a judgment in ten paragraphs, entered by the court below, the plaintiff, Roberta S. Bryant, has prosecuted an appeal against Pleas Hamblin, Richard F. Hickman, the Sutton heirs, and the Sumner heirs, while Richard F. Hickman and the Sutton heirs are prosecuting an appeal against Roberta S. Bryant and Pleas Hamblin.

The several defendants not only claim all, or a major portion, of the land described in the petition, but claim the land as against one another, and to certain portions of the land involved in this lawsuit there are three or more claimants. Some of the defendants filed no pleadings, and no proof was taken in their behalf; others filed pleadings, took proof and from the judgment, in so far as it denied their claim, they have appealed.

The present appeal, therefore, resolves itself into a contest as to ownership of the land involved, as between Roberta S. Bryant, Pleas Hamblin, Richard F. Hickman, the Sutton heirs and the Sumner heirs, the case having been briefed on behalf of each and all of the above named.

Pleas Hamblin is the son of Jackson Hamblin, and represents the heirs of his father. Title is claimed by the various parties under surveys and by adverse possession. We will discuss the case under several sub-

heads, taking up in order the claims of each of the parties to the appeal.

Sumner heirs. In paragraph six of the judgment it is adjudged that the heirs of Nehemiah Sumner are entitled to the three tracts set out in their answer not covered by the claims of David Privitt or the possession and title of Pleas Hamblin. The court then specifically describes the property so adjudged to the Sumner heirs, together with the several tracts excluded therefrom.

It is agreed between the parties that appellant, Roberta S. Bryant, is the owner by title of record to the Hudson & Wait 10,000 acres patent No. 24,081. The tracts adjudged the Sumner heirs are included within the exterior boundaries of the Hudson-Wait patent.

The land claimed by the Sumner heirs is alleged to be embraced within the exclusion of the foregoing patent. By an act of the legislature of 1835 (Session Acts, p. 359) control of all vacant lands was vested in the several county courts, by the later act of 1837 (Session Acts, p. 250) provision was made for the appointment of a county treasurer to whom application for the purchase of this land should be made, warrant for the land purchased to be issued by the county clerk upon presentation to him of a receipt given by the treasurer.

March 9, 1846, the following order was entered in the Whitley county court: ''Received a bond of Middleton Meadors for twenty dollars ($20) for 800 acres of vacant land in Whitley and the clerk of the Whitley county court is authorized to issue a warrant for the same this 9th day of March, 1846.

''(Signed) JAMES K. GALLION, C. T.''

''The Commonwealth of Ky. to the surveyor of Whitley county, greetings. You are hereby authorized and directed by yourself or deputy to survey in one or more surveys for Middleton Meadors 800 acres of vacant and unappropriated land in your county, he having produced to me the county treasurer's receipt for a bond for twenty dollars ($20), the price thereof, as required by law, and this shall be your warrant for the same.''

Copies of the two surveys referred to in the judgment are found in the record, the one being for Nehemiah Sumner as assignee, the other for Sumner, Lamb and Easthouse as assignee under warrant 272 to Middleton Meadors.

Construing the acts of 1835 and 1837 as authority for such, the Whitley county court sold much of the vacant land for notes and bonds. This manner of disposing of these lands led to the passage of the act of March 5, 1850 (Session Acts 1849-50, p. 399), legalizing the receipt of bonds in the sale of vacant land in Whitley county, said bonds or their proceeds to be appropriated for road purposes the same as if the money had been paid therefor. Said act made it unlawful thereafter for the Register of the Land Office to receive or register any plat or certificate of a survey made by the surveyor of Whitley county, upon county warrants, without a certificate from the county treasurer accompanying it, showing the land had been paid for in money or labor according to the order of said court.

By an act approved March 18, 1851 (Session Acts 1850-51, p. 305) the citizens of Whitley county were given until March 1, 1852, to return plats and certificates of said surveys to the Register of the Land Office, as provided in the act of 1850.

In Bryant v. Kentucky Lumber Co., 144 Ky. 755, in speaking of these several acts, especially the last one, the court said: ''The plain purpose of this act was to require all these matters to be closed up by March 1, 1852; that is, the parties who had made these surveys were given a year to pay the price and take out their grants. The necessary meaning of the statute is that they were required to pay the price and register their surveys within the time specified and that they could not do so thereafter. The Gillis survey was made on February 28, 1851, or eight days before the passage of this act. Gillis had under the act until March 1, 1852, to return the plat and certificate of survey to the Register of the Land Office with a certificate of the treasurer of the county that the warrants had been paid for. When he did not do this, he lost all his rights under the warrant or survey. If it should be held that the statute is not mandatory, and that these surveys could be carried into grant by a compliance with the statute after the time fixed in it, then it would be meaningless, and the purpose of its enactment would be defeated. The rule is that under statutes conferring privileges on private individuals for a certain period of time, the privilege can not be exercised after the time allowed. (36 Cyc. 1160; Black on In-

terpretation of Laws, 359, 26 Am. & Eng. Ency. of Law, 691, and cases cited.)

"It is insisted that the receipt of the treasurer is for a bond for $1,000.00, and that we can not say now what sort of a bond this was; but when the receipt is read in the light of the legislative acts above referred to, there is no question what it means. It refers to one of the bonds which the Whitley county court, by its orders, allowed taken. The county treasurer was not authorized by the act of 1837 to take anything but money, and he does not receipt for money. He did not take the bond as money; he receipted for what he got, a bond. His receipt does not show that anything was paid and there is nothing in the record to indicate that anything has ever been paid on this land from that time to this."

To the same effect is Ford v. Bryant, 158 Ky. 97, wherein, after quoting from the opinion in the above case, the court says: "In view of the above authorities, we conclude that the expression 'plotting out of this survey all lands heretofore surveyed,' contained in the Hudson and Wait survey, applies only to valid surveys, and does not include surveys which were never perfected in the manner required by the statute."

The Bryant mentioned in the above two cases is the present appellant, and those appeals involved the same patent herein referred to.

By the order of the county court of March 9, 1846, it will be seen that the warrant was ordered issued on the execution of a bond for $20, "the price thereof as required by law." There is nothing in the record showing a compliance on the part of the patentee or those claiming under him, with the provision of the acts of 1850 and 1851. March 1, 1852, was the final date fixed in the latter of these two acts for filing the plat or certificate, accompanied by the treasurer's receipt.

Passing on this question we said in Stephens v. Terry 178 Ky. 129, 141: "A copy of the bond executed by Cox, Williams and McLancy is not on file, but it can only be concluded, that it was one executed in accordance with the order of the county court and described in the acts of the legislature with reference to them, above quoted. The provisions of the act of March 8th, 1851, do not mention entries or the disposition of warrants, which had been issued upon the execution of bonds, and where no entries were ever made, but, as it renders invalid a sur-

vey, made by virtue of such a warrant, which had not been filed with the register and the land paid for before the first day of March, 1852, it would seem that an entry made under such a warrant and not carried into grant before the first of March, 1852, and the land paid for, would, also, be invalid, as well as such a warrant, which was not entered, survey made and returned to the register before that date. The purpose of the act was to make an end of the practice of issuing warrants, where the land authorized to be appropriated was not paid for. Furthermore, it is apparent, that the holder of such a warrant could not make an entry by virtue of it, or a survey under it, after the first day of March, 1852. . . . Cox, Williams and McLancy had until March 1st, 1852, to survey the entry made under the warrant, No. 464, pay for the lands and file their survey with the register, but they did nothing of the kind. Doubtless they recognized that their warrant and entry were both invalid after March 1st, 1852, as they took no other steps in regard to them.''

It is true, as urged by counsel for the Sumner heirs, that a party must recover upon the strength of his own title. Nor is it sufficient, as against one claiming under a valid grant, that the property in contest is embraced within the exterior boundary of the patent; it must be shown that it is not within the exclusion.

But, to use the language of the court in Bryant v. Meaders, 183 Ky. 651; the exclusions apply to ''only subsisting legal entries and surveys that are excluded by such reference in a patent and for which the statute invalidates subsequent entries, surveys or patents.'' In this suit the court referred to the cases in which the Hudson and Wait patent has been upheld as a valid patent by this court. The question there involved was whether a survey made December 21, 1853, upon which a patent for 200 acres was issued to Jacob E. Harmon, through whom the appellees claimed, was a valid survey. The order of the Whitley county court in that suit was issued in consideration of a bond as in the instant suit, and not for a cash consideration, as required by the acts of 1835 and 1837; after referring to the acts of 1850 and 1851, the court quotes, with approval, from Bryant v. Kentucky Lumber Co. and Stephens v. Terry, *supra*.

We do not think the claim of the Sumner heirs is based upon a valid subsisting legal entry, patent, or sur-

vey as of the date of the Hudson and Wait survey and patent, and hence, as to them, the court erred in so far as it adjudged them to be owners of any of the land in contest.

Richard F. Hickman. The claim of Hickman was dismissed by the lower court because he did not show title in himself to any part of the land claimed by him. He was granted and has taken an appeal from that judgment, making Roberta S. Bryant and Pleas Hamblin appellees, inasmuch as the land claimed by him was awarded to them.

The schedule in this case directs the clerk to copy the entire record so far as it affects Richard F. Hickman, and others named, including all of the pleadings and orders with reference thereto. After a careful examination of the entire record, we have been unable to find any pleading filed or tendered by Hickman. We find depositions of said Hickman and other witnesses in his behalf, and since the appeal is briefed on his alleged claim we will treat the case as at issue as to Hickman.

Counsel, with commendable forethought and to save expense and facilitate the preparation and trial of this complicated suit, by an agreed order entered March 6, 1915, controverted of record all the affirmative matter in all pleadings.

Hickman was made a defendant in an amended petition, in which it was alleged that Hickman and other defendants were claiming an interest in the land described in the petition. Traversing this allegation would not aid his cause.

From the brief we find Hickman is claiming title by purchase from Mark Creekmore to 100 acres above Crow creek, being one-half of a 200 acre survey made by Nicholas White in 1844, and also claims title by adverse possession. Hickman claims to have made a crop on the land in 1877, and later to have leased the land to Jackson Hamblin, father of Pleas Hamblin, 23 to 30 years ago. The senior Hamblin was dead at the time this deposition was taken, and all parts of the deposition relating to conversations with decedent were excepted to. He introduced three other witnesses to prove the lease. The reputation of one of these for truth and veracity is said to be bad; another, on cross-examination, testifies that he had in mind an entirely different tract of

land. The third witness testifies to a conversation with the elder Hamblin as to the erection of a fence on what is claimed as the Hickman land, and he does not remember when this conversation took place. Hickman says it was supposed to be all the land between Cantrill creek and Crow creek, and when asked to give the boundary set out in the original survey, he thus describes it: "Beginning at the mouth of Cantrill creek, I believe, is the best of my knowledge, marked on water birches and a pine, I believe, running down with the meanders of the river 190 poles to a black oak or water oak at the first branch below Crow creek; running up the hill northeast to a post oak on a ridge to a side of a path; thence north several degrees, don't remember exactly, to a black oak on a ridge, thence north again more degrees than the first; I don't remember how many degrees, so many degrees east, was more degrees east than any other, I remember, to a black oak on the top of a ridge, then the line turned again north; I don't remember exactly what the next corner was or how far it was. . . .

"There was two or three other corners running up there and made a smoothing iron shape and the next corner where it made the next turn on a poplar near the Hollow Rock, 325 poles. Crossing Crow creek to the George Sumner land, known as the Jim Sumner survey. It went on to the Sugar creek fork on Crow creek, as well as I remember, to a bunch of sugar trees, and it was marked on the sugar trees. It went from there across the divide between Crow creek or the sugar tree fork and Cantrill creek. That is my understanding; it ran to Cantrill and then down to Cantrill creek to the beginning."

No written evidence is produced showing his ownership of the land, no deed, patent, entry, survey or tax receipt, either by original or copy. True he testifies he had a copy of a survey and the last time he saw it was eight or nine years before giving his deposition, when it was in the hands of two persons in Williamsburg. He does not introduce either of these, but states that both of them "say they have not got them." He further states that the survey was recorded in the surveyor's book—he saw it there in 1876—that later one of his attorneys told him that after this survey was copied into a new book the leaf containing the plat had been torn or cut out of the book. He has never personally examined the book to verify this alleged fact, nor does he introduce

the surveyor or any other person to prove same, and yet, on this vague, doubtful, unfixed and hazy description and evidence we are asked to adjudge title in him. This we cannot do. The chancellor did not err in dismissing his claim.

Sutton Heirs. The Sutton heirs claim the one-half, or 100 acre survey of Nicholas White, below Crow creek; they also claim under a Jack Harmon survey of about 1842, and also by adverse possession. J. F. Sutton, who was made a defendant in the original petition, filed an answer controverting the allegations thereof. The death of said Sutton is noted in the amended petition, and his widow, Emily Sutton, and two children, Stella Gillis and Henry Sutton, as his only heirs-at-law, are made defendants. They have appealed from the judgment dismissing their claim, making Roberta S. Bryant and Pleas Hamblin appellees.

Much we have said about the Hickman claim applies to this, at least that part where their rights are based on the Nicholas White survey.

We will discuss their claims first under the surveys and then by adverse possession.

I. The surveys. The Nicholas White survey was never carried into patent. Neither the White nor the Harmon surveys are of record; counsel says the originals are lost and could not be produced.

There is no pleading by the Sutton heirs setting up any claim to any portion of the land described in the petition, nor in the answer of Pleas Hamblin—no boundary is claimed by them. Thus we meet with practically the same indefiniteness and uncertainty as confronted us relative to the claim of Hickman, and the proof as to the Sutton title is almost as vague. Counsel concedes that the evidence as to the Harmon survey is meager, also that there is little evidence as to when that survey was made.

II. Adverse possession. We have read and reread the depositions taken on behalf of these parties, and without entering into a detailed discussion of same, we deem it sufficient to say we cannot find testimony that would warrant us in reversing the judgment as to them. For example, James White, in speaking of the deal between Harmon and Sutton, says: "Well, it was land there about Crow creek, below this Nicholas White land, is the way I understand it"—he did not know how many acres, nor the date of the survey, and never saw any survey.

G. W. Early found one corner tree about 40 poles from the river. Says that Joe Sutton did not live on the surveys. Witness purchased a one-half interest of Harmon tract from Sutton. He claimed to have a copy of the Nicholas White survey, which was lost, and when asked if it covered any of the land he now claimed an interest in, he responded: ". . . Nothing, only we started from where they told us had been a corner and started up on that line and run that far and it came night and we quit and never got back any more."

Mark Creekmore never saw but two of the corners. It will be remembered that no pleading was filed by Hickman and only a traverse by the Sutton heirs, hence neither by pleading has set up any definite boundary claimed by them.

It is in evidence that about the year 1880 Sutton built a fence enclosing the lands to which he claims title. Logs, brush and rails entered into its make-up and cliffs were used wherever possible, one of the witnesses saying: "We cliff-fence down there a whole lot." S. R. Sutton says the fence was kept up for about four years, when it burned, that is, most of the rails were destroyed. It is doubtful if any part of the claimed boundary could be located, other than by occasional reference to the "Long Bottom," "Sheep Park," "Bend in the river," "Buzzard," "Crow creek," etc.

The lines are not marked by courses or distances; a few marked trees are referred to, but practically no lines any one could follow.

To support a title by adverse holding three facts must be established: (a) the possession must have been continuous, actual, open, notorious and peaceable for at least fifteen years; (b) the exterior boundary lines of the land claimed must be well defined, that is, either actually enclosed or so marked that the land is susceptible of identification by its description, and (c) the possession must have been of such a character and extent as to exclude the idea that the right of possession was in any one else.

The rambling, uncertain and indefinite character of the evidence, coupled with the silence of the pleading as to the boundary claimed by the Sutton heirs, can lead to but one conclusion, viz., the lower court did not err in dismissing their claims.

Jackson Hamblin's heirs. In paragraph seven of the judgment it is adjudged that Pleas Hamblin is the owner (1) of the surface of the land contained in the boundary described therein, being between Cantrill Branch and Crow Branch; (2) another tract on Cantrill Branch; (3) a tract on Cumberland river and (4) a tract on the south bank of the river.

By an agreement between Roberta S. Bryant and Pleas Hamblin, the controversy as to them is reduced to the Sanford T. Barnett patent for 200 acres surveyed June 4, 1883. Barnett's being the junior patent, the claim, if any, of the Hamlin heirs must be based upon adverse possession.

Reverting to the evidence we find—Pleas Hamblin, in his deposition, taken March 20, 1915, testifies (in narrative form), that he has claimed this land, "18 or 19 years, according to his recollection." It has been enclosed for 18 years or somewhere near about that. He and his father paid the taxes. In another place he says the fence referred to in the record as the "sheep park fence," was put up 17, 18 or 19 years ago. Two-thirds of the fence consists of cliffs; the wire fence is just across the gaps. At the time the fence was erected he never heard his father say he claimed to own all the land inside the fence. He fenced it for herding purposes, following the cliffs because it made less work to fence it. Only knows of three marked lines in the Barnett survey. When asked if either he or his father ever had any clearings or made any improvements upon the Barnett patent since they had the fence around it, he says: "Right along up in here some clearings run outside a little bit." About two acres in all or probably a little more than that. He states it had been cleared for about seventeen years.

L. E. Bryant is a son of plaintiff and his deposition was taken on interrogatories propounded by the Hamblin heirs, and he thus testifies as to the fence: "Jack Hamblin was a long standing acquaintance of mine. I saw him at most every court four times a year at Williamsburg. Early in our acquaintance he proposed to me to permit him to enclose about 1,000 to 1,500 acres of our wild land with a wire fence for a sheep ranch, and keep them out fire and protect the timber and hold possession of the land for as at that time we had many adverse claims to our land and this seemed a practical plan from a friend and after consulting the family I consented. Mr.

Hamblin and I talked the matter over from time to time when he would report to me of the claims of others and the condition of our possession. He never held adversely to us."

Sanford T.Barnett and wife deeded,without warranty, their undivided interest in this land to the senior Hamblin, March 24, 1898, for a consideration of twenty dollars.

Summing up the testimony on this branch of the case it appears that about 23 years ago the senior Hamblin, while fencing the Hawkins McKee survey, so extended or erected the fence as to include about two and one-half acres of the tract in controversy.

About 17 years before his deposition was taken he testifies this small tract was cleared up, and at the time it was fenced Pleas never heard his father say he claimed it as his own land.

At most it would seem the enclosure and clearing of this 2½ acres was accidental and unintentional, and without claim of right or possession on the part of Jackson Hamblin at the time. The petition in the present suit was filed January 30, 1912, hence at this date the period of occupation was less than fourteen years. The clearing was coincident with the execution of the deed from Barnett and his wife, which bears date of March 24, 1898. Pleas Hamblin, in his deposition taken March 20, 1915, says the clearing was made 17 years before, which would make it March, 1898.

Possession to defeat title must be actual, as well as adverse and continuous, and to a well defined and marked boundary for as much as fifteen years before the institution of an action by the holder of the legal title. Gatliff v. Carson-Muse Lumber Co., 159 Ky. 833; White v. McNab, 140 Ky. 820.

We think the court was in error in adjudging that Pleas Hamblin was the owner of the tract described in paragraph seven of the judgment.

The schedule and record. A motion of Pleas Hamblin to strike from the transcript all parts not embraced in the schedule was passed to the submission on the merits. The schedule in this case directs the clerk to copy the entire record in so far as it affects the parties to the appeal, and contains this sentence: "All of the pleadings and orders with reference thereto are directed to be copied, to-wit:" and here follows an enumeration of 44 different items. The appellees' contention is that the

record contains more than called for in the schedule, and that the record actually contains 83 different pleadings, depositions, etc. It is true that the record does contain a great many more separate orders or pleadings than are referred to in the schedule, but this apparent discrepancy is explained, in the main, by the fact that the schedule in one item called for the depositions of certain parties, whereas in the transcript there appear a number of depositions filed in behalf of said party. As an illustration, an item in the schedule calls for the depositions of the Sutton heirs; as a matter of fact there are six depositions for them in the record. This, we think, explains the apparent difference complained of by counsel. Another place the schedule calls for an order filing an amended petition; this appears in the transcript under two headings, first the order itself and second the amended petition, and we do not suppose that counsel would contend that in this instance the schedule did not call for the amended petition. Counsel do not claim or contend that any parts of the record have been omitted, but their objection is there is too much record here. Furthermore, that a discretion was given the clerk as to what parts of the record should be copied, the schedule having directed the clerk to copy the entire record so far as it affected any of the parties to the appeal. Unless there is an omission of some portion of the record affecting some of the parties the motion to strike should be overruled, because it does not appear upon an examination of the record there were any portions copied not pertinent to the appeal on behalf of any of the several parties. Sec. 737 of the Civ. Code provides, in part, as follows: "The appellant, within ninety days after the granting of the appeal, shall file in the office of the clerk of the inferior court a schedule, showing, concisely, what parts of the record he wishes to have copied. His failure to file said schedule within the time prescribed shall be cause for the dismissal of his appeal."

A notice of the filing of this schedule was served on Pleas Hamblin. The notice states that the schedule directs the copying of the entire record so far as it affected Pleas Hamblin and others to the appeal. We think this was ample notice to him as to what parts of the record would be included in the transcript. Provision is made in the section of the Code, *supra*, by which the appellees may file a schedule similar to the one the appellant

is permitted to do. The clerk certifies that the record filed in this court "is a true and correct copy of so much of the record as is directed by the schedule."

Appellee complains the schedule does not direct the copying of the appellant's petition. The first order called for in the schedule is thus given, "O. B. 38, page 30," which we assume was the petition, although not specifically mentioned, but we do not see how the directions to copy the entire record could be obeyed, or the record certified as complete without the petition.

Rule 14 of this court is as follows: "The court will conclusively presume, after submission, that a record brought up to this court on schedule filed in the clerk's office of the inferior court, as prescribed by section 737 of the Code of Practice, is the complete record, and that all parties interested have consented to try the appeal on such record. Before submission the court will, in its discretion, allow a transcript of other parts of the record to be filed when deemed necessary in furtherance of justice." See also Clevinger v. Nunnery, 140 Ky. 592, wherein the court says: "Under the rule, where a schedule has been filed as prescribed by section 737 of the Code, it will be presumed that all that is material in the record is contained in the transcript, and that the parties have consented to try the appeal on the transcript; but the rule has no application unless the schedule has been filed in the clerk's office as prescribed by section 737 of the Code."

We think under the provision of the Code, the rule and authority above cited that appellee's motion to strike from the transcript should be overruled.

Wherefore, upon a consideration of the whole case and for reasons hereinabove given, the judgment appealed from, in so far as it affects the Sutton heirs and Richard F. Hickman, is affirmed; as to the Sumner heirs, the judgment is reversed, and as to the Hamblin heirs and Pleas Hamblin so much of paragraph seven as adjudges that Pleas Hamblin is the owner of the tract of land described as: "Beginning at a maple and black oak; thence, N. 40 E. 38 poles to two chestnut oaks; thence N. 10 E. 32 poles to a post oak on a ridge; thence N. 62 E. 40 poles to a chestnut and black oak; thence N. 4 E. 18 poles to a black gum; thence N. 60 W. 20 poles to a black oak; thence N. 45 W. 36 poles to a poplar and white oak; thence N. 49 W. 10 poles to a black oak;

thence N. 100 poles to a stake at the Hollow Rock; thence west 320 poles to the Cumberland river; thence up the river with the meanders thereof to the beginning,'' be, and the same is, hereby reversed, and this case is remanded to the lower court for such further proceedings as may be necessary and consistent with this opinion.